UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PRIMERICA LIFE INSURANCE CO., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| SEAN BAILEY, DOWN THE ROAD | * | Civil Action No. 20-cv-10743-ADB |
| BREWERY, INC., JIMMY CROTT, and | * | |
| AYBIKE CROTT, | * | |
| | * | |
| Defendants. | * | |
| | * | |
| | * | |

## MEMORANDUM AND ORDER DENYING SEAN BAILEY'S
## MOTION FOR SUMMARY JUDGMENT

BURROUGHS, D.J.

Primerica Life Insurance Co. ("Primerica") initiated this action by filing an interpleader

complaint based on competing claims to the benefits of a life insurance policy held by Donovan

Bailey ("Donovan"), who is now deceased.[1]  [ECF No. 1].  Currently before the Court is

Crossclaim Defendant Sean Bailey's ("Bailey") motion for summary judgment, which seeks

dismissal of Crossclaim Plaintiffs Jimmy and Aybike Crott's (the "Crotts") crossclaim for unjust

enrichment.  [ECF No. 41].  For the reasons set forth below, Bailey's motion is DENIED.

---

[1] The Court refers to Donovan Bailey as "Donovan" so as to avoid confusion with Crossclaim
Defendant Sean Bailey.

I.      **BACKGROUND**

      A.      **Factual Background**

Except as otherwise noted, the following facts are undisputed.[2]

      1.      <u>DTR and the Crotts' Loan</u>

Donovan founded, operated, and served as the president of Down the Road Brewery, Inc. ("DTR"), a craft brewery in Everett, Massachusetts.  [ECF No. 47-1 ¶ 1].  Around January 2017, the Crotts loaned DTR $300,000 and DTR executed a Convertible Note in connection with the loan.  [ECF No. 47-1 ¶¶ 2–3; ECF No. 47-2 at 7–13 (copy of Convertible Note)].  Donovan signed the Convertible Note on behalf of DTR in his capacity as DTR's president.  [ECF No. 47-1 ¶¶ 4–5].  Under the terms of the Convertible Note, DTR was obligated to repay any loan made by the Crotts.  [Id. ¶ 4].  Section 5.2 of the Convertible Note states that

> [i]n the event of [Donovan's] death before the end of the 36th month following the date hereof, the [Crotts] shall be entitled by written notice delivered within thirty (30) days of [Donovan's] death to declare any unpaid and unconverted principal and accrued interest to be due and payable and such amounts shall be due and payable in cash on the later of ninety (90) days from the date of demand or the date the company received proceeds from any life insurance policy held by it on [Donovan's] life for this purpose.

[ECF No. 47-2 at 10 (copy of Convertible Note)].

DTR and the Crotts also executed a Subscription Agreement, which Donovan signed on behalf of DTR in his capacity as DTR's Chief Executive Officer.  [ECF No. 47-1 ¶¶ 6–7; ECF No. 47-2 at 15–25].  Section 3.13 of the Subscription Agreement states that

> [t]he Company has or will within thirty (30) days of the execution hereof acquire an insurance policy on the life of [Donovan] with a face amount of at least $300,000

---

[2] Unless otherwise noted, the Court draws the facts from Bailey's statement of material facts, [ECF No. 43], the Crotts' response to Bailey's statement of material facts and additional material facts, [ECF No. 47-1], Bailey's response to the Crotts' statement of additional material facts, [ECF No. 49], and the documents referenced therein.

> which, at the election of the [Crotts], shall be used to satisfy any amounts due to the [Crotts] pursuant to the Note on his death.

[ECF No. 47-2 at 17 (copy of Subscription Agreement)].

In January 2017, Donovan also executed an employment agreement with DTR stating

that

> [t]he Company will provide medical, dental, vision and life insurance benefits customarily offered to Executive Directors, subject to approval by a majority vote of the Board of Directors.

[ECF No. 47-2 at 40 (copy of employment agreement); ECF No. 47-1 ¶ 10]. The Crotts contend

that DTR's Board of Directors (the "Board") never approved a life insurance policy for

Donovan. [ECF No. 47-1 ¶ 10 (response); ECF No. 49 ¶ 1].[3]

On April 9, 2017, Donovan took out an $800,000 Term Life Insurance Policy (the

"Policy") from Primerica. [ECF No. 47-1 ¶ 11]. The Crotts maintain that the Policy was

intended to fulfill DTR's obligations under Section 3.13 of the Subscription Agreement, [ECF

No. 47-1 ¶ 11 (response)], although Bailey disputes this. The Crotts were initially named 38%

beneficiaries and DTR was named a 62% beneficiary of the Policy's proceeds. [Id. ¶ 15]. As

38% beneficiaries, the Crotts would be entitled to approximately $300,000. [Id. ¶ 15 (response)].

Part 3 of the Policy states that Donovan, as the Policy's owner, could, on written notice to

Primerica, change the beneficiaries at any time prior to his death. [ECF No. 47-1 ¶ 16]. In

October 2018, without the Crotts' knowledge, Donovan requested that Primerica change the

---

[3] Bailey objects to this statement of fact because Aybike Crott did not serve as a Director of DTR at the time that the employment agreement was signed and therefore the Crotts lack personal knowledge of the Board's actions. [ECF No. 49 ¶ 1 (response)]. While Aybike Crott may not have been a Director in 2017, it is conceivable that when she served as a Director from December 2018 until May 2019, [id.], she would have learned of, and therefore had personal knowledge of, the Board's prior decisions. Further, as noted below, as the moving party, Bailey has not put forth any evidence to demonstrate that the Board did approve a life insurance policy for Donovan.

Policy's beneficiaries from the Crotts and DTR to Bailey, his brother.  See [Id. ¶ 17].  As a result, as of October 2018, Bailey became the Policy's sole beneficiary.  [Id. ¶ 18].  Although the Crotts do not dispute that the Policy gave Donovan the ability to change the beneficiaries, they assert that it was not their intention, nor Donovan and DTR's intention, that Donovan would be able to change the beneficiaries to defeat their interest in the Policy's proceeds and to instead benefit his own family.  [Id. ¶ 16 (response); ECF No. 49 ¶ 2].[4]

2.    Bailey's Relationship to DTR

Bailey is a software engineer at Nuance Communications.  [ECF No. 47-1 ¶ 19].  He has never been an officer, director, or employee of DTR, never owned any shares of DTR's stock, and never provided any service to or on behalf of DTR.  [Id. ¶¶ 20–22].  In 2013–2014, prior to Donovan starting DTR, Bailey volunteered at beer festivals and helped review Donovan's business plans.  [Id.¶ 23].  After DTR was founded, Bailey continued to volunteer at beer festivals and other events held at the brewery.  [Id.].  Bailey also loaned money to Donovan to help him with DTR, and avers it was because he wanted his brother to be successful.  [Id. ¶ 24].  Bailey's loans to DTR totaled at least $6,400.  [Id. ¶ 24 (response); ECF No. 47-2 at 43].  In exchange for these loans, Bailey took a convertible note that he hoped would be paid back, although DTR did not ever make any payments under the convertible note and Bailey never exercised his right to convert the debt into equity.  [ECF No. 47-1 ¶¶ 25–26].

---

[4] Bailey also objects to this statement of fact and argues that the Crotts cannot demonstrate that they had personal knowledge of DTR and Donovan's intentions.  [ECF No. 49 ¶ 2 (response)].  Bailey does not dispute that the Crotts can testify as to their own intentions.  [Id.].  As participants in the discussions and events surrounding the Convertible Note and Subscription Agreement, the Crotts had firsthand knowledge of what occurred and can at least testify as to their understanding and perception of those events.

3.      Competing Claims to the Policy's Proceeds

On July 31, 2019, Donovan passed away at the age of forty-six.  [ECF No. 47-1 ¶ 27].

The Crotts learned about Donovan's death on August 4, 2019.  [ECF No. 49 ¶ 10].

Bailey maintains that he did not know that Donovan had a life insurance policy until after

his death when he and his father looked for Donovan's will.  [ECF No. 47-1 ¶¶ 33–34].  The

Crotts dispute Bailey's account of when he learned about the Policy.  [Id. ¶ 33 (response)].

Eventually, Bailey contacted Primerica and learned that he was the Policy's beneficiary.  [Id.

¶ 38].  Primerica sent Bailey a Claimant's Statement Form on August 9, 2019 and Bailey

submitted a signed and notarized form, along with a certified copy of Donovan's death

certificate, on August 22, 2019.  [Id. ¶¶ 39–40].  On August 15, 2019, the Crotts contacted

Primerica and asserted their claim to a portion of the Policy's proceeds.  [ECF No. 47-2 at 52–

53].

Bailey asserts that he first learned that the Crotts were also seeking a portion of the

proceeds of the Policy around August 15, 2019 and, until that time, he did not know about the

Crotts, or that they had loaned money to DTR and held the Convertible Note.  [ECF No. 47-1

¶¶ 41–42].

**B.      Procedural History**

Primerica filed a complaint on April 15, 2020 to interplead the Crotts and Bailey on the

matter of the payout of the Policy.  [ECF No. 1].  The Crotts then asserted two crossclaims

against Bailey for equitable substitution and unjust enrichment.[5]  [ECF No. 16].  On March 11,

2021, the Court dismissed the Crotts' crossclaim for equitable substitution, but allowed their

---

[5] The Crotts' crossclaim complaint originally labeled this cause of action "constructive trust," but
the Court has interpreted it as a claim for unjust enrichment.  [ECF No. 36 at 5].

unjust enrichment crossclaim to proceed.  [ECF No. 36].  Bailey filed his motion for summary

judgment on the remaining crossclaim on March 31, 2021.  [ECF No. 41].  The Crotts opposed

the motion on April 30, 2021, [ECF No. 47], and Bailey filed his reply on May 10, 2021. [ECF

No. 48].

II.      **LEGAL STANDARD**

Summary judgment is appropriate where the moving party can show that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor

of either party.'"  Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (quoting Vineberg

v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).  "A fact is material if its resolution might affect

the outcome of the case under the controlling law."  Cochran v. Quest Software, Inc., 328 F.3d 1,

6 (1st Cir. 2003) (citation omitted).  Thus, "[a] genuine issue exists as to such a fact if there is

evidence from which a reasonable trier could decide the fact either way."  Id. (citation omitted).

By invoking summary judgment, "the moving party in effect declares that the evidence is

insufficient to support the nonmoving party's case."  United States v. Plat 20, Lot 17, 960 F.2d

200, 204 (1st Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

"To succeed in showing that there is no genuine dispute of material fact, the moving

party must . . . . 'affirmatively produce evidence that negates an essential element of the non-

moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the

non-moving party will be unable to carry its burden of persuasion at trial.'"  Ocasio-Hernández

v. Fortuño-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015) (quoting Carmona v. Toledo, 215 F.3d 124,

132 (1st Cir. 2000)).  Conversely, "[t]o defeat a properly supported motion for summary

judgment, the nonmoving party must establish a trial-worthy issue by presenting enough

competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v. Town of Kingston, N.H., 303 F.3d 91, 94 (1st Cir. 2002) (internal quotation marks and citation omitted).  That is, the nonmoving party must set forth specific, material evidence showing that there is "a genuine disagreement as to some material fact." Plat 20, Lot 17, 960 F.2d at 204 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986)).

In reviewing the record, the Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6.  The First Circuit has noted that this review "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and material[,]" Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the Court may discount "conclusory allegations, improbable inferences, and unsupported speculation." Cochran, 328 F.3d at 6 (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

III.     DISCUSSION

A.     Bailey's Knowledge of Donovan's Conduct

Bailey contends that no reasonable factfinder could conclude that he was unjustly enriched because there is no evidence that he knew about Donovan's decision to change the beneficiary designation at the time he made the change or any time prior to his passing.  [ECF No. 42 at 8–10].  Relying on a case from this district, Bailey argues that a lack of such knowledge is fatal to an unjust enrichment claim because the required elements of such a claim are "1) a benefit conferred on the Defendant by the Plaintiff; 2) an appreciation or knowledge of the benefit by the Defendant; 3) the acceptance or retention of the benefit by the Defendant under

circumstances which make acceptance or retention inequitable." [Id. at 7–8 (quoting In re

Telexfree Secs. Litig., 389 F. Supp. 3d 101, 106 (D. Mass. 2019))].  The Crotts, pointing to

Massachusetts caselaw, counter that Bailey's prior knowledge of Donovan's decision to make

him the Policy's beneficiary is not a required element of the claim and that any lack of

knowledge does not mandate summary judgment in his favor.  [ECF No. 47 at 9–13].

        "The most reliable guide to the interpretation of state law is the jurisprudence of the

state's highest court."  Butler v. Balolia, 736 F.3d 609, 612 (1st Cir. 2013) (citing Kathios v.

Gen. Motors Corp., 862 F.2d 944, 946 (1st Cir. 1988)).[6]  Massachusetts defines "[u]njust

enrichment . . . as 'retention of money or property of another against the fundamental principles

of justice or equity and good conscience.'"  Koufos v. U.S. Bank, N.A., 939 F. Supp. 2d 40, 52

(D. Mass. 2013) (quoting Santagate v. Tower, N.E.2d 171, 176 (Mass. 2005)).  "A plaintiff

asserting a claim for unjust enrichment must establish not only that the defendant received a

benefit, but also that such a benefit was unjust, 'a quality that turns on the reasonable

expectations of the parties.'"  Metro. Life Ins. Co. v. Cotter, 984 N.E.2d 835, 850 (Mass. 2013)

(quoting Global Investors Agent Corp. v. National Fire Ins. Co., 927 N.E.2d 480 (Mass. App. Ct.

2010)).

        In a December 2021 opinion, the Massachusetts Supreme Judicial Court ("SJC")

reiterated that "liability for unjust enrichment . . .  may extend to recipients who were not

responsible for wrongful conduct."  Sacks v. Dissinger, 178 N.E.3d 388, 398 (Mass. 2021).  The

Sacks case involved facts similar to those currently before the Court.  In that case, the plaintiffs

learned that they were removed as beneficiaries from their grandfather's trust and sued their

---

[6] Both parties appear to agree that Massachusetts law governs this claim.  [ECF No. 42 at 7–8
(citing to Massachusetts law); ECF No. 47 at 9–10 (same)].

grandmother's estate and aunts, alleging that the aunts had received a larger share of the

grandfather's estate due to one aunt and the grandmother's undue influence over the grandfather.

Id. at 391.  The plaintiffs brought claims of unjust enrichment and intentional interference with

their inheritance.  Id.  In concluding that an innocent party can be unjustly enriched, the SJC

cited to several of its past decisions and noted that the common theme in cases where an innocent

party has been held liable is that the innocent parties "have benefited directly due to the harm

one person has tortiously perpetrated against another."  Id. at 399.  The SJC did not expressly

limit liability to cases where the third party knew about a benefit at the time that any wrongful

conduct occurred.

To the extent that a defendant's knowledge of a benefit is a required element of an unjust

enrichment claim, Bailey has not directed the Court to any caselaw holding that the defendant

must know about the benefit at the time that any allegedly wrongful conduct occurred and/or

before the benefit was conferred onto the defendant.  [ECF No. 42 at 10 (stating, without citing

any caselaw, that the "the relevant time period" is "prior to Donovan's death")].  Although the

First Circuit has previously stated that an unjust enrichment claim requires a plaintiff to

demonstrate that the defendant had an appreciation or knowledge of the benefit received, the

Court is not aware of any First Circuit cases that explicitly state that any knowledge must occur

within the timeframe that Bailey proposes here.  See e.g., Mass. Eye & Ear Infirmary v. QLT

Phototherapeutics, Inc., 552 F.3d 47, 57 (1st Cir. 2009), decision clarified on denial of reh'g, 559

F.3d 1 (1st Cir. 2009); Tomasella v. Nestle USA, Inc., 962 F.3d 60, 82 (1st Cir. 2020).

Further, those First Circuit cases that recited the "appreciation or knowledge" element did

not involve facts analogous to those here, i.e., a third party receiving a benefit due to the alleged

wrongdoing of another.  Instead, those cases analyzed circumstances where the plaintiff directly

provided a service or benefit to the defendant and the defendant did not pay for or deserve that benefit.  For example, in Tomasella, the plaintiff, on behalf of a proposed class, alleged unjust enrichment on the part of chocolate producers because they did not disclose the use of child labor in the cocoa supply chain, plaintiff continued to pay the producers for candy, and the producers were unjustly enriched as a result of their wrongful conduct.  Tomasella, 962 F.3d at 67–68.  Though it recited the elements of an unjust enrichment claim, the First Circuit panel ultimately did not apply them and instead affirmed dismissal of the claim because an adequate remedy at law was available.  Id. at 84.

Likewise, in Massachusetts Eye and Ear Infirmary, the plaintiff brought an unjust enrichment claim after it shared confidential information with the defendant, which the defendant then improperly disclosed for profit without compensating the plaintiff. Massachusetts Eye & Ear Infirmary, 552 F.3d at 62.  The plaintiff further claimed unjust enrichment because the defendant induced it to pursue broad claims during a patent prosecution, this decision was beneficial to the defendant, and defendant did not compensate plaintiff.  Id. at 66.

Accordingly, though a reasonable factfinder may ultimately determine that the circumstances here do not demonstrate that Bailey's receipt of the Policy's proceeds is unjust, the mere fact that Bailey did not have knowledge of Donovan's conduct at the time that he made the beneficiary change or prior to his passing is insufficient at this stage to require that conclusion.

10

B.      Bailey's Remaining Arguments

Although Bailey's lack of knowledge alone is insufficient to dismiss the unjust

enrichment claim, he also raises two other arguments in support of his motion for summary

judgement.

First, Bailey contends that the Policy was obtained and held by Donovan personally, not

DTR, and therefore the Crotts cannot possibly assert a claim to the proceeds since the Crotts

contracted with DTR, not Donovan.  [ECF No. 42 at 2, 10–11].  The Crotts argue that Bailey's

position elevates form over substance.  [ECF No. 47 at 6–8].  In support, Aybike Crott, in her

declaration, represents that it was the Crotts, DTR, and Donovan's understanding that the Policy

was held in order to satisfy DTR's obligations under Section 3.13.  [ECF No. 47-2 ¶¶ 10–11].

In determining whether a benefit received was unjust, the Court considers "the reasonable

expectations of the parties."  Metro. Life Ins. Co., 984 N.E.2d at 850.  Indulging all reasonable

inferences in the Crotts' favor, a factfinder could conclude that the purpose and intent of the

Policy was to satisfy the obligation set forth in Section 3.13 of the Subscription Agreement, even

though Donovan, not DTR, was the policyholder.  Fundamentally, when Donovan originally

took out the Policy, he named the Crotts as beneficiaries to approximately $300,000, which

could lead to the reasonable expectation that the purpose of the Policy was to cover their

$300,000 loan.  Additionally, although Donovan's employment agreement permitted him a life

insurance policy as a benefit of his position, the agreement plainly specified that any such policy

must be approved by DTR's Board.  Bailey, as the moving party, has not put forth any evidence

that the Policy was authorized under this provision, which would be relevant to determining

whether the policy was connected to DTR or was Donovan's personal property.  Accordingly, a

genuine dispute of material fact exists as to whether Donovan, DTR, and the Crotts reasonably

expected the Policy to satisfy DTR's obligations under Section 3.13, despite Donovan, rather than DTR, being listed as the policyholder.

Second, Bailey argues that the Crotts have waived any argument that they are entitled to the Policy because they did not comply with the procedure outlined in Section 5.2 of the Convertible Note, which states that "the [Crotts] shall be entitled by written notice delivered within thirty (30) days of [Donovan's] death to declare any unpaid and unconverted principal and accrued interest to be due and payable and such amounts shall be due and payable in cash on the later of ninety (90) days from the date of demand or the date the company received proceeds from any life insurance policy held by it on [Donovan's] life for this purpose." [ECF No. 42 at 10–12; ECF No. 47-2 at 10]. Bailey avers that this provision gave the Crotts 30 days to demand that the Policy proceeds be used to pay any outstanding debt and that they did not do so. [ECF No. 42 at 10–12]. The Crotts counter that Section 5.2 does not provide the exclusive remedy for them to claim a right to the Policy's proceeds. [ECF No. 47 at 8].

The Crotts have the better argument here. The permissive language of Section 5.2, that the Crotts "shall be entitled" to demand repayment in 30 days in the event of Donovan's death, is alone not enough to prove that the Crotts were *required* to submit written notice within 30 days or risk forgoing the proceeds of any life insurance policy held pursuant to Section 3.13 of the Subscription Agreement.

## IV.    CONCLUSION

Accordingly, Bailey's motion for summary judgment, [ECF No. 41], is <u>DENIED</u>. The parties are to appear for a status conference on <u>February 10, 2022</u> at <u>10 a.m.</u>

13

**SO ORDERED.**

January 28, 2022                                              /s/ Allison D. Burroughs
                                                             ALLISON D. BURROUGHS
                                                             U.S. DISTRICT JUDGE